## YOUNGSTOWN TELEGRAM v ROCK

Ohio Appeals, 7th Dist, Mahoning Co

Decided Oct 20, 1933

Kennedy & Kennedy, Youngstown, for plaintiff in error.

Fred J. Heim, Youngstown, for defendant in error.

90

**OPINION**

By ROBERTS, J.

The issue, and the only issue in this case, is a determination of the proposition as to whether or not T. A. Ball in this accident was operating his car for himself, personally, and he alone was responsible for this accident, or whether in operating his car at the time and place in question he was the agent of the Youngstown Telegram, and as such his conduct became the conduct of the Youngstown Telegram.

The trial resulted in a voluminous record of some eight hundred pages. However, the nature of the issue is such that it will not be necessary to make any extended reference to the evidence or to the elaborate briefs of counsel.

The evidence in this case discloses that at the time of this accident the Telegram was and had been for years what is denominated a "six day newspaper." It did not have and never had a Sunday edition. It had a large number of rural distributors, who went out in all of the surrounding territory for a considerable distance, one, for instance, going up into Trumbull County as far as Gustavis, another going out into Pennsylvania, towards New Castle, and another to Sharon, and various other directions. Among these local distributors was this man T. A. Ball, who had what is denominated the Lake Milton Route. These routes ordinarily were about seventy-five miles in extent. These carriers went to the office of the Telegram early in the morning, got their papers and made their distributions, presented their accounts to the Telegram and were paid by that paper for those services.

There was also published at this time, and perhaps still is, in Pittsburgh, the Pittsburgh Press. Both of these papers were Scripps-Howard papers and this paper published a Sunday edition. Evidently there was some conference between representatives of these papers, resulting from a desire on the part of the Pittsburgh Press to extend the volume of sales of its Sunday paper up into Youngstown and its environment, and negotiations to some extent took place whereby it was thought to be mutually advantageous for these papers and also for these rural paper carriers that an arrangement be made whereby these paper carriers could take out on Sundays the Sunday edition of the Pittsburgh Press. This would enable the Press to enlarge its circulation, perhaps be of interest to the Telegram in competition with the Vindicator, which is a seven day paper, by having distributed in connection with its weekly edition a Sunday edition, and also of financial interest to these rural carriers, who could then, if they desired, work seven days in a week and receive additional compensation. These carriers had been receiving from fifteen to twenty-five dollars a week for their services, with an allowance for the use of their car of about fifteen dollars per week, paying their own expenses for oil and gasoline and so forth, furnishing their own cars and receiving one cent for each copy of the Telegrams so sold. This proposition involved paying of carriers three dollars per day extra for delivering Presses on Sunday and three cents remuneration for each paper sold.

It can readily be seen that such an arrangement might be desired, and perhaps was mutually advantageous to all of these parties. It would extend the circulation of the Press, assist to some exent, perhaps, in the weekly circulation of the Telegram, and the carriers be made more contented with an opportunity for earning more money. The question really is whether in entering into this arrangement the Telegram incurred any responsibility as principal for these carriers on Sundays, when they were engaged in the delivery of the Press and not of the Telegram.

To establish this agency, reliance is largely placed by the defendant in error upon a circular letter, which just previous to the time this service was generally distributed among the patrons of the Telegram through these carriers. It was further a part of this plan that one issue of the Press be distributed free by the Telegram carriers on a certain day, and also a copy of this letter be delivered, and this letter reads as follows. It is under the heading of the Youngstown Telegram, printed:

Youngstown, Ohio

Good Morning

Now you can secure delivered to you the Sunday edition of The Pittsburgh Press, the same edition that is delivered to readers in Youngstown and Pittsburgh.

The Youngstown Telegram, in conjunction with the Pittsburgh Press—a Scripps-Howard newspaper—has arranged through its Motorized Route Service to make delivery every Sunday morning of the Sunday Pittsburgh Press.

This service is being inaugurated especially for your convenience and you may now avail yourself of the opportunity of having your paper delivered to you seven days a week.

Accept this copy of the Sunday Pittsburgh Press with our compliments. Compare it with ANY Sunday paper you have ever read. You will easily be able to determine which paper is serving you with the latest, most up-to-date and complete news.

If you are now a daily Telegram reader, the Sunday Pittsburgh Press will enable you to complete a full week's reading of the latest news, a full week of the best, most wholesome and entertaining comics, such as Major Hoople, Out Our Way and Wash Tubbs, besides receiving a complete and up to the minute magazine section.

Subscribing for the Sunday Pittsburgh Press, or the daily Youngstown Telegram does not obligate you in any way. You pay no money in advance, neither do you sign for any length of time. You give your verbal order to our representative when he calls—which will be either Monday or Tuesday—and we shall be glad to serve you promptly and regularly.

Yours very truly,

J. A. Finster, Circulation Director,
THE YOUNGSTOWN TELEGRAM.

It is not doubted but that the terms of this letter indicate an interest on the part of the Telegram in making this arrangement for the Sunday distribution of the Sunday Press. Whether it was simply embracing a gratuitously offered opportunity to secure this benefit and assuming no responsibility or liability for the enterprise, or whether it thereby became the principal of these men while acting in the service of the Press in distributing that paper is the question for determination in this action. This scheme may have been initiated primarily by A. C. Derr, an official of the Press, but was carried out at that time by William Dugan, an employe and representative of the Press, and hand-

led to some extent by William Hall, who was an employe of the Telegram. Through these men these rural carriers were gotten together and a statement made to them of this plan. At this meeting of the carriers and Mr. Hall there is no dispute in the testimony as to substantially what was said by Hall. He outlined this proposition, suggested to the men that it gave them this added opportunity for employment, increased remuneration, and stated to them that they were under no obligation so far as the Telegram was concerned to take on this additional duty or service, that they might do as they desired, so far as that matter was concerned.

That testimony is sought to be contradicted and an interest shown of the Telegram in the position of principal assumed by reason of the contention that it was said by Mr. Hall, representing the Telegram, in effect, that this was a scheme in the interest of the Telegram by saying that this Sunday service of the Press could be used as a whip to line up competition with the Vindicator, which had a Sunday edition. Mr. Hall, who was originally a defendant and the man who was immediately responsible for the accident, while he admits in his testimony substantially what has been said of the statement Hall made to him and the other carriers, attempts to say that Hall in a private conversation made some statement to him indicating interest on the part of the Telegram, whereby, as just suggested, the Sunday Press could be used as a whip over the Vindicator. Perhaps the weight to be given to the testimony of Hall is lessened somewhat by his evident interest in the result of this hearing. It is apparent from his very extended testimony that he is adverse to the Telegram and endeavoring to favor the plaintiff, Mrs. Rock. He answers questions propounded by counsel for Mrs. Rock fully and quite glibly and with a good recollection. His testimony on cross examination on the other side indicates a loss of memory and an equivocation which does not appear when inquired of by the other side. He was examined by counsel for plaintiff as of cross examination, because then he was a party, but after he and the other witnesses testified then he was dismissed as a party.

Two other witnesses undertake to testify to a somewhat considerable extent, indicating interest on the part of the Telegram in this scheme, and they are H. W. Schmidt and O. R. Scott, both of whom had been previously employed by the Telegram, and

while their testimony was not particularly important or persuasive, it does develop that they entertain sentiments hostile towards the Telegram. They were discharged employees who were involved in falsification of circulation records and who went upon the stand in those cases and testified against the Telegram.

Upon the other hand, the evidence indicates that there were some twelve or thirteen of these rural carriers, not all of whom testified. Some half a dozen did testify, and all of them who testified stated that the opportunity was given them to do this Sunday work, coupled with the statement that they might do it or not, as they might individually desire, and their failure to take on this employment would not affect their other relations with the Telegram in any way, or words to that effect.

Several of these people did not take on the Sunday work for the Press but continued as before for the Telegram. Some did this work for greater or lesser periods of time and then discontinued, without any apparent effect, so far as any interest of the Telegram was concerned. Among these were H. A. Ross, Leo Singler, Harry Dugan and Mrs. Vincent. Mrs. Vincent lived over in Pennsylvania somewhere and had been delivering the Telegram for ten years, making these night drives accompanied by her three children. She was a widow. She took on this work and discontinued it after some little time, for the reason, as she expressed it in her testimony, that it became too monotonous.

There is no dispute whatever in the testimony but that these rural carriers were under the direction and control of the Pittsburgh Press during the performance of this Sunday service, without interference on the part of the Telegram; that their accounts for remuneration for services were presented to and paid by the Press, through its agents and representatives, without reference whatever to the Telegram. These papers came by mail to Youngstown, arriving at the depot at one-twenty A. M., Sunday. Some concern then hauled them over to the sidewalk adjacent to the Telegram building, where they were unloaded and from where they were distributed. A man by the name of Dugan had been employed by the Press to look after this distribution and the care of this Sunday business. This manner of service proving to be too expensive, Dugan was relieved and as a more economical way Mr. Hall, who was an employe of the Telegram, and who did work for the Telegram

six days of the week, was employed to work Sundays for the Press in the distribution of these papers to the carriers, and paid ten dollars per Sunday by the Press.

The testimony shows that Hall went to this location when the papers were delivered and counted out the number of papers which each carrier desired, he having given notice on Friday or Saturday of the number of papers he wanted. Sometimes Hall would not go there and the men picked up the morning papers each might desire and then they would distribute them. Hall was a one-armed man, and by reason of his physical disability had some trouble in making out his reports and doing his clerical work in this connection and his other connections with the Press. Another man by the name of Miller was also an employe of the Telegram, and, as shown by the evidence, without contradiction, Miller, as the result of kindly feeling towards Hall, and a desire to assist him, did some kind of clerical work, making our reports and other such services for Hall in reporting to the Press, without compensation.

There is no contention that these services performed by Miller had any connection whatever with his work for the Telegram. Now, another matter which might be mentioned, which has been urged in behalf of defendant in error as indicating agency, is that after the accident there was found in Hall's car a few issues of the Telegram of several days earlier date, and it developed on examination of other carriers that they sometimes had, when they went out on Sundays, a few old Telegrams in the car. It was the testimony of these witnesses—Hall did not claim it was the result of request or pressure exerted by the Telegram to undertake to send earlier Telegrams on Sunday, but sometimes in going over the route somebody would want a Telegram of Friday or Saturday before, and occasionally a sale was made that way, and he was in the habit, and some of the others also, of carrying some old papers, but some of the carriers said that they had not cleaned out their cars from the previous day's trip, so that testimony fails to exhibit, so far as it is concerned, any action desired on the part of the carrier, so far as the distribution of the Telegram on Sunday is concerned.

Now, it should be remembered that these men in distributing Sunday papers never communicated in any way, so far as their remuneration is concerned, with the Telegram. No one representing the Telegram ever communicated with them. They made

out their bills to the Pittsburgh Press, and the Pittsburgh Press settled with them without any connection on the part of the Telegram. Supposing the Press had failed to settle for these papers; supposing the men failed to get their pay for these services, it may be pertinent to inquire whom these carriers would naturally sue, if it was necessary to maintain an action to recover, or who would be considered liable. While, as suggested before, this scheme may have been mutually advantageous to the parties, they were simply doing a little work in a relation in the way indicated, whereby the employees of the Telegram were taken over by the Press for the day. These men did not work for the Telegram on this day. All were mutually benefitted. It does not follow, however, that the position or relation of principal and agent was assumed by the Telegram so far as these carriers were concerned on Sunday, when the men were not in the service of the Telegram. There is nothing to indicate that there was ever any thought or belief of incurring of liability by their weekly employees doing this work on Sunday.

After a careful consideration of this evidence, what has been urged by counsel in extensive briefs in connection therewith, we fail to find such connection between the Telegram and these men in their Sunday services for the Press as to indicate that the Telegram ever assumed the position or liability of principal for the conduct of these men while thus in the service of the Press in the delivery of the Sunday papers. The judgment of the court in finding in favor of Mrs. Rock is against the decided and manifest weight of the evidence, and the judgment of the Court of Common Pleas is reversed.

Judgment reversed.

FARR and POLLOCK, JJ, concur in the judgment.